## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Tonya Louise Cole, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services LLC, | ) | **COMPLAINT** |
| | ) | **WITH JURY TRIAL DEMAND** |
| Defendant. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

Under the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*., consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and, the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting agency.

1

Equifax Information Services LLC is a consumer credit reporting agency. Equifax Information Services LLC "plays an essential role in the global economy by helping financial institutions, companies, employees, and government agencies make critical decisions with greater confidence."[1] This includes "serving customers globally." Equifax Information Services LLC in involved in 24 countries across the world.[2]

Plaintiff has a legally protected interest in Equifax Information Services LLC maintaining information concerning Plaintiff's credit worthiness, credit standing, credit capacity, character, and general reputation, in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information. 15 U.S.C. § 1681 ("Congressional findings and statement of purpose").

This case arises from Equifax Information Services LLC's violation of Plaintiff's legally protected interest and Equifax Information Services LLC's widespread pattern and practice of willfully disregarding its duties under the FCRA, including, but not limited to:

---

[1] See, https://www.equifax.com/newsroom/ (accessed January 15, 2021).
[2] See, https://www.equifax.com/about-equifax/company-profile/ (accessed January 15, 2021).

2

- Disregarding balances and other information reported by furnishers of credit information, and instead inserting false, manufactured balance information in consumer reports, and publishing said false information to third parties, in willful violation of its FCRA-mandated duty to follow reasonable procedures to ensure maximum possible accuracy of information when preparing consumer reports;

- Failing to appropriately reinvestigate information disputed by consumers, in willful violation of its FCRA-mandated duty to conduct reasonable reinvestigations of consumers' disputes;

- Failing to notify furnishers of disputed information of consumers' disputes, in willful violation of its FCRA-mandated duty to do so;

- Improperly deleting disputed tradeline information, in willful violation of its duties imposed by the FCRA;

- Failing to provide consumers with prompt notice of the deletion of disputed tradeline information by telephone, in willful violation of its duties imposed by the FCRA;

- Failing to provide consumers with a description of the procedures used to determine the accuracy and completeness of disputed information, in willful violation of its duties imposed by the FCRA; and

3

- Failing to provide consumers with the business name, address, and telephone number of any furnisher of information contacted in connection with the disputed information, in willful violation of its duties imposed by the FCRA.

## **PARTIES**

1.     Plaintiff, Tonya Louise Cole, is a natural person who resides in Gwinnett County, Georgia.

2.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3.     Defendant, Equifax Information Services LLC (hereinafter "Equifax"), is a limited liability corporation formed under the laws of the State of Georgia. Equifax may be served with process via its registered agent, Lisa Stockard, at 1550 Peachtree Street Northwest, Atlanta, Georgia 30309.

4.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

5.     This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

6.     This Court has personal jurisdiction over Equifax, pursuant to O.C.G.A. § 9-10-91(1), because Equifax frequently and routinely conducts business in the State of Georgia, including the conduct complained of herein.

7.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district. Pursuant to LR 3.1B(3), N.D.Ga., venue is proper in the Atlanta Division because Equifax maintains an agent for service of process within the Atlanta Division.

### Factual Allegations Regarding Plaintiff's Mortgage

8.     On or about April 1, 2016, Plaintiff obtained a loan from Quicken Loans Inc. (hereinafter "Quicken") for the original principal amount of $91,425.00 (the "Mortgage").

9.     The Mortgage is collateralized by residential real property located at 990 Harbins Road, Unit 4C, Norcross, Georgia 30093, as evidenced by the Security Deed recorded at Deed Book 54218, Page 401, in the Superior Court of Gwinnett County.

10.    Quicken regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. §§ 1681i and 1681s-2.

### Factual Allegations Regarding Plaintiff's Bankruptcy Case

11.    On February 8, 2019, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 19-52243 (the "Bankruptcy Case").

12.    In Schedule D of her Bankruptcy Petition, Plaintiff listed Quicken as having a secured claim for the Mortgage in the amount of 52,066.60.

13.    On March 28, 2019, Plaintiff filed her Chapter 13 Plan in accordance with 11 U.S.C. § 1322(b)(5), providing for the cure of any then-deficiency and the direct payment of all future Mortgage payments by Plaintiff to Quicken.

14.    On June 12, 2019, Plaintiff's Plan was confirmed.

15.   Quicken was served with a copy of the Confirmation Order on June 14, 2019, by the Bankruptcy Noticing Center.

16.   Plaintiff's Confirmed Plan does not call for the surrender of the collateral securing the Mortgage owing to Quicken, and Plaintiff has not surrendered the collateral securing the Mortgage owing to Quicken.

17.   Accordingly, Plaintiff is not seeking a discharge of her Mortgage. Indeed, the Mortgage is not subject to discharge pursuant to 11 U.S.C. § 1328(a)(1). See, *In re Duke*, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

18.   The Bankruptcy Case is currently pending, and Plaintiff continues continue to substantially perform under the terms of her Confirmed Plan and the underlying Mortgage note.

19.   Quicken continues to hold and or service Plaintiff's Mortgage, and Plaintiff continues to materially perform per the terms of the Mortgage note.

20.   The balance of Plaintiff's Mortgage is not $0.00.

21.   Plaintiff's Mortgage is not closed.

### Factual Allegations Regarding Consumer Reports
### Containing Incorrect Information

22.   The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general

reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the following: a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to; the review or collection of an account of the consumer; the underwriting of insurance involving the consumer; determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; used by a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; used by a person who otherwise has a legitimate business need for the information; used in connection with a business transaction that is initiated by the consumer; to review an account to determine whether the consumer continues to meet the terms of the account; and/or used by executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards. 15 U.S.C. §§1681a(d)(1) and 1681b(a)(3).

23.    The terms "consumer report," "credit report," and "consumer credit report" are used synonymously herein.

24.    The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Approximately two million consumer reports are issued by credit bureaus each day. See,

Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p 48-49, available at

*https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf*

(accessed November 16, 2017).

25.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors, and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p iv of Executive Summary, available at

*https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf* (accessed November 16, 2017).

26.    The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

27.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major, because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure. *Id*. at i.

28.    Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See,    *https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/* (accessed November 16, 2017).

**Factual Allegations Regarding the Consumer Credit Reporting Industry, Reporting Standards, and Disputed Information**

29.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

30.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

31.    In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515*.

32.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in

compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

33. The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

34. Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data in those consumer reports.

35. § 1681i(a)(5)(D) of the FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.

36. To comply with the automated dispute reinvestigation requirements of the FCRA, the three national CRAs (Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc.) along with Innovis Data Solutions, Inc. developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR

(Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant.

See, *http://www.e-oscar.org/.*

37.   The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

38.   ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

39.   Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with its duties under § 1681e in compiling and reporting data with maximum possible accuracy in consumer reports.

40.   Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with its duties under § 1681i in correcting disputed information and thus maintaining the maximum possible accuracy of data reported in consumer reports.

## Factual Allegations Regarding Consumer Reports Containing Incorrect Information, and the Impact on Scoring

41.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit scoring system, and utilizes data reported by credit reporting agencies. See, *https://www.myfico.com/credit-education/credit-scores/* (accessed November 16, 2017).

42.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

43.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at

*http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf* (accessed November 16, 2017).

44.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10%

14

of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, *www.myfico.com/credit-education/whats-in-your-credit-score/*.

45.    Payment history is the most important aspect of a consumer's credit score, because it shows how the consumer has managed their finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing their accounts, when their last payments were made, and any recent charges. See, *https://www.transunion.com/credit-score* (accessed November 16, 2017).

46.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

47.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

48.    Incorrectly reporting the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—with a $0 balance, adversely affects

the consumer's FICO score, as it excludes any recent positive payment history associated with that mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

49. The improper deletion of the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—adversely affects the consumer's FICO score, as it excludes all positive payment history associated with that mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

50. Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

51. Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

52. Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including but not limited to the length and age of credit history, and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at

*https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf*

(accessed November 16, 2017). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

53.   Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id.*, at 22.

54.   Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See, *https://www.consumer.ftc.gov/articles/0152-credit-scores*.

55.   The National Association of Insurance Commissioners (NAIC) is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. See, *http://www.naic.org/index_about.htm*.

56.     The NAIC, advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm.

57.     Payment history, credit history length, and credit mix (the types of credit a consumer has, such as credit cards, a mortgage, auto loans, etc.) account for 60% of a consumer's credit-based insurance score. *Id.*

58.     Incorrectly reporting the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—with a $0 balance adversely affects the consumer's credit-based insurance score, as it excludes any positive payment history associated with that mortgage, it misrepresents the credit history length, and it misrepresents the credit mix.

59.     The improper deletion of the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—adversely affects the consumer's credit-based insurance score, as it excludes any positive payment history associated with that mortgage, it misrepresents the credit history length, and it misrepresents the credit mix.

## **Factual Allegations Regarding Reporting by Equifax**

60.   On or about November 15, 2019, Plaintiff obtained a copy of her consumer report as published by Equifax.

61.   Plaintiff's Equifax consumer report contained factually false, derogatory information published and reported by Equifax. Specifically, Equifax reported that Plaintiff's Mortgage owing to Quicken had a blank balance and was reporting a status of closed. In addition to the foregoing factual inaccuracies, the tradeline included language that, when read in conjunction with the false blank balance, created the misleading impression that the Mortgage had been discharged in Plaintiff's Bankruptcy Case.

62.   A true and correct copy of the Quicken tradeline at issue appeared in Plaintiff's report as follows:

### 3.1 QUICKEN LOANS, INC. (CLOSED)

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | | Reported Balance | |
|---|---|---|---|
| | xxxxxxxxx 0861 | | |
| Account Status | INCLUDED_IN_CHAPTER_13 | Debt-to-Credit Ratio | N/A |

19

| Terms Frequency | MONTHLY | Term Duration | 0 |
|---|---|---|---|
| Balance | | Date Opened | Apr 01, 2016 |
| Amount Past Due | | Date Reported | Nov 04, 2019 |
| Actual Payment Amount | | Date of Last Payment | Oct 01, 2019 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 42 | Delinquency First Reported | Feb 01, 2019 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Conventional Real Estate Mortgage | Date Closed | |
| Date of First Delinquency | Feb 01, 2019 | | |

| Comments | Contact |
|---|---|
| Bankruptcy chapter 13 | QUICKEN LOANS, INC. |

63.     Because Plaintiff's Mortgage is not closed, and because Plaintiff continues to make payments pursuant to the Mortgage note, the foregoing derogatory information was inaccurate, misleading, and false.

64.     Upon information and belief, Equifax's reporting of the Quicken tradeline with a blank balance and a status of closed was not reflective of the accurate, factually correct balance that Quicken reported to Equifax.

65.     Upon information and belief, Equifax manufactured the false, derogatory closed status.

66.     Upon information and belief, Equifax has published this false, derogatory information to third parties, including but not limited to the following:

LexisNexis on April 1, 2019; LexisNexis on August 16, 2019; Midnight on August

22, 2019; and CIC/Experian Reports on February 5, 2020.

67.    In a letter dated March 30, 2020, Plaintiff disputed the inaccurate and

misleading information directly to Equifax. Plaintiff identified the inaccurate and

misleading information, advised Equifax of the specific facts that rendered the

disputed reporting inaccurate and misleading, and informed Equifax that the

inaccurate and misleading information was harming Plaintiff's credit rating. The

relevant portion of Plaintiff's dispute is reproduced below.

> My mortgage with Quicken Loans, Inc., 1050 Woodward Avenue, Detroit, Michigan 48226, account number XXXXXXXXX0861, is reporting incorrectly. My mortgage is included in my bankruptcy (case number 19-52243, filed February 8, 2019) and is provided for by my bankruptcy plan, but it is a long-term debt that is not subject to discharge. Further, my mortgage *cannot* have been discharged, as my bankruptcy is ongoing, and thus *none* of my debts have been discharged.
>
> I am disputing the following incorrect information that is being reported in the tradeline for my mortgage with Quicken: The balance is not $0, and the account is not closed. I am including copies of the documents filed in my bankruptcy that show that the account is not closed. Please contact Quicken to confirm this information and update this tradeline. Please forward the enclosed documents to assist Quicken with its review.

68.    In support of her dispute, Plaintiff included with the dispute to Equifax

a copy of her Chapter 13 Bankruptcy Plan, a copy of the Order Confirmting

Plaintiff's Chapter 13 Bankruptcy Plan, a copy of Quicken's Proof of Claim, and a

copy of Quicken's Notice of Mortgage Payment Changes.

69.    Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Quicken of

Plaintiff's dispute within five business days of receiving the dispute, to forward all

relevant information and any documents included with Plaintiff's dispute for Quicken to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Plaintiff's consumer file.

70.   In a document dated May 6, 2020, Equifax requested documents of identification from Plaintiff before sending a response to her dispute.

71.   On or about June 10, 2020, Plaintiff resubmitted her dispute to Equifax along with a copy of her driver's license and a copy of her social security card.

72.   Plaintiff resubmitted her June 10, 2020 dispute with tracking number 9171 9690 0935 0231 4745 23.

73.   Plaintiff's resubmitted dispute was delivered to Equifax on June 14, 2020.

74.   In a document dated June 18, 2020, only four days after the receipt of Plaintiff's dispute, Equifax advised Plaintiff that it had researched her dispute and provided a revised report that reflected its findings.

75.   The reinvestigation report simply deleted the entire tradeline for the Quicken Mortgage account. The relevant portion of that reinvestigation is reproduced below.

>>> We have researched the credit account. Account # - 867335397* The results are: This item has been deleted from the credit file. If you have additional questions about this item please contact:  Quicken Loans Inc., 1050 Woodward Ave, Detroit  MI  48226-1906 Phone: (800) 508-0944

76.    Upon information and belief, Equifax did not notify Quicken of Plaintiff's dispute within five business days of receiving the dispute.

77.    Upon information and belief, Equifax did not forward all relevant information and the documents included with Plaintiff's dispute for Quicken to review.

78.    Upon information and belief, Equifax did not perform any reinvestigation of Plaintiff's dispute, under either standard procedures or "Expedited Dispute Resolution" procedures, as described by § 1681i(a)(8), but instead simply deleted the entire tradeline for the Quicken Mortgage account.

79.    Plaintiff's dispute was neither frivolous nor irrelevant.

80.    Equifax did not inform Plaintiff that it had determined the dispute was frivolous or irrelevant.

81.    Equifax did not identify any additional information required to investigate Plaintiff's dispute.

82.    Equifax did not call Plaintiff regarding the Quicken tradeline deletion, as required for an "Expedited Dispute Resolution" under § 1681i(a)(8).

83.    However, Equifax *did* inform Plaintiff) of her right to request a description of the procedure used to determine the accuracy and completeness of the disputed information, including the business name and address of any furnisher of

information contacted in connection with such information and the telephone number of such furnisher, if reasonably available, in accordance with § 1681i(a)(6)(B)(iii).

84.   On or about August 5, 2020, Plaintiff caused a letter to be sent to Equifax (the "Procedures Request"), requesting a description of the procedures Equifax used to determine the accuracy and completeness of the disputed Quicken Mortgage information in Plaintiff's credit file and on her consumer report.

85.   Plaintiff's August 5, 2020 letter also specifically requested that Equifax provide the business name, address, and telephone number of any furnisher of information that Equifax contacted in connection with the information in Plaintiff's credit file and on her consumer report.

86.   While Plaintiff was aware of *an* address for Quicken, and included that address in Plaintiff's dispute, data furnishers often maintain multiple addresses, and Plaintiff sought to determine the specific address at which Equifax actually contacted Quicken in connection with Plaintiff's dispute.

87.   Equifax had an affirmative duty to provide Plaintiff with the requested business name and contact information not later than 15 days after receiving Plaintiff's request pursuant to 15 U.S.C. § 1681i(a)(7).

88.   Equifax was not relieved of this duty simply because Plaintiff had *an*

address for Quicken, and had included that address in Plaintiff's dispute.

89.   On September 1, 2020, Equifax replied to Plaintiff's Procedures Request

with a nonresponsive form letter (the "Form Letter").

90.   A reproduction of the relevant portion of the Form Letter appears as

follows:

**Answers To Your Questions**

\* **In reference to your question regarding the investigation process:**

Upon receipt of your dispute, we first review and consider any relevant information you submitted regarding the nature of your dispute. Often, Equifax will then transmit your dispute to the furnisher of the information (ie. the bank associated with a disputed credit card) for review and investigation. Equifax electronically sends a notification of your dispute, including a summary of the relevant information submitted, to the respective furnisher. The furnisher reviews the information provided, conducts an investigation with respect to the disputed information and reports the results back to us electronically.

In the case of a public record item such as a judgment, tax lien or bankruptcy, Equifax seeks the most recent filing associated with the disputed information. This information is often obtained from a medium (ie. paper records or computer database) prescribed by the source of the information (ie. courthouse or other government entity). Equifax may use a business vendor to obtain the most recent filing from the public record source.

As appropriate, Equifax then makes deletions or changes to your credit file. The name, address and, if reasonably available, the telephone number of the furnisher(s)/source(s) of the information contacted while processing your dispute(s) is shown under the "Results of your investigation" section on the cover letter that accompanies the copy of your revised credit file.

91.   15 U.S.C. § 1681i(a)(7) required Equifax to provide Plaintiff with "a

description of the procedure <u>used</u> to determine the accuracy and completeness of the

information"; instead, the form letter provided only a general description of the

various ways in which Equifax responds to consumers' disputes. [Emphasis added.]

92.   The Form Letter informed Plaintiff only of what Equifax *might have*

*done* in response to her dispute, in violation of Equifax's statutory duty to inform

consumers of what it *actually did* to respond to a consumer dispute.

93.   The Form Letter also failed to provide the business name, address, and telephone number of any furnisher of information contacted in connection with the disputed information.

94.   Instead, the form letter stated, "The business name, address, and, if available, telephone number of the furnisher(s) of information contacted in connection with your dispute can be found in the "Investigation Results" document you recently received at the conclusion of our investigation of your last dispute."

95.   However, as the Quicken tradeline had been deleted, this information was not included in the "Investigation Results" document.

96.   Equifax therefore failed to provide the business name, address, and telephone number used to contact Quicken in connection with the dispute, in violation of 15 U.S.C. §§ 1681i(a)(6)(B)(iii) and (a)(7).

97.   Equifax failed to describe the procedures it actually used to determine the accuracy and completeness of Plaintiff's Quicken account because no such procedures existed, as Equifax made no attempt at all to determine the accuracy and completeness of Plaintiff's Quicken tradeline.

98.   Equifax did not provide the business name, address, or telephone number of any furnisher of information contacted in connection with the disputed

information, because Equifax did not contact any furnisher of information in connection with the disputed information.

99.   Instead, Equifax simply deleted the Quicken tradeline, without conducting a reasonable reinvestigation or providing Quicken with proper notice of the dispute.

100.   By deleting the tradeline without investigating the dispute or notifying the furnisher, Equifax willfully and recklessly disregarded its duties under the FCRA.

101.   Plaintiff's Procedures Request followed Equifax's own directions on how to obtain information which Plaintiff is specifically legally entitled to receive under the FCRA.

102.   Nevertheless, Equifax's reply was a mere form letter, which was not responsive to the Procedures Request and merely directed Plaintiff back to the reinvestigation report (which contained no useful information, since Equifax deleted the entire tradeline for the Quicken Mortgage account).

103.   Plaintiff, following Equifax's instructions, requested specific information from Equifax regarding the procedures Equifax followed and the contact information Equifax used to contact Quicken when it allegedly reinvestigated Plaintiff's dispute and deleted information from her credit file and consumer report.

104. Despite its clear legal obligation to provide this information, which Plaintiff was legally entitled to receive, Equifax willfully failed to do so in reckless disregard of its duties under the FCRA.

105. Equifax failed to identify any specific procedure which Equifax actually used in reinvestigating Plaintiff's dispute.

106. Equifax failed to provide any specific detail of the procedures because, in fact, it followed none.

107. Equifax failed to provide the name, address, and telephone number of any furnisher of information that Equifax contacted in connection with Plaintiff's dispute.

108. Equifax failed to provide the name, address, and telephone number of any furnisher of information that Equifax contacted in connection with Plaintiff's dispute because, in fact, Equifax never notified Quicken of Plaintiff's dispute.

**Equifax's Violations of § 1681e Were Willful**

109. 15 U.S.C. § 1681e(b) requires Equifax to follow reasonable procedures to assure maximum possible accuracy of information whenever it prepares a consumer report.

110.  There is no objectively reasonable interpretation of § 1681e(b) under which Equifax may legally prepare and publish a consumer report that contains information that Equifax knows to be false.

111.  Equifax is not directly involved in the consumer credit transactions about which Equifax reports.

112.  Rather, Equifax merely assembles and/or evaluates consumer credit information provided to Equifax by creditors/furnishers who *are* engaged in extending credit to consumers.

113.  Accordingly, the furnishers of such information know far better than the Equifax what is accurate and factually correct with respect to the balance, status, payment history, etc. of the consumer credit information that furnishers report to Equifax.

114.  Despite the central role of the furnisher in ensuring accurate credit information, Equifax regularly disregards the accurate and factually correct mortgage balance that furnishers report to Equifax.

115.  Instead of reporting the accurate and factually correct mortgage balance, Equifax regularly manufactures false data, and publishes consumer reports that incorrectly state consumers' mortgages have a blank balance and a status of closed.

116. These falsified consumer reports, including the manufactured closed status, are regularly published to third parties.

117. Equifax's regular practice of reporting this false, manufactured information is objectively unreasonable in light of the statutory language of § 1681e(b), which requires Equifax to "follow reasonable procedures to assure maximum possible accuracy of the information" whenever Equifax prepares a consumer report.

118. In this case, Equifax has disregarded the accurate and factually correct Mortgage balance that Quicken reported to Equifax, and has reported the Mortgage to third parties as having a blank balance and a status of closed.

119. Equifax knew that Plaintiff's Mortgage was not closed at the time Equifax prepared Plaintiff's consumer report.

120. Equifax knew that Plaintiff's Mortgage was not closed at the time Equifax published Plaintiff's consumer report to third parties.

121. The closed status contained in Plaintiff's consumer report, and published to third parties, was known by Equifax to be false and derogatory because the information was manufactured by Equifax.

122. No conceivable, objective reading of Equifax's obligations under § 1681e would allow Equifax to ignore accurate information provided by a furnisher,

manufacture other, inaccurate information, and then use the inaccurate information to falsify a consumer's report.

123.  Equifax's fabrication and dissemination of false, derogatory information about Plaintiff, rises above simple negligence or a careless reading of the statute.

124.  Equifax's fabrication and dissemination of false, derogatory information about Plaintiff was done knowingly and with reckless disregard of its legal duty to follow reasonable procedures to assure maximum possible accuracy of information.

125.  Equifax's fabrication and dissemination of false, derogatory information about Plaintiff was willful.

126.  Equifax's fabrication and dissemination of false, derogatory information about Plaintiff made it highly probable that Plaintiff would be injured.

127.  Plaintiff was, in fact, injured, as detailed more fully *infra*.

128.  Equifax's violations of § 1681e were a direct and proximate cause of Plaintiff's injuries, as detailed more fully *infra*, and, as a result, Equifax is liable to Plaintiff for the full amount of statutory damages, punitive damages, along with the attorneys' fees and the costs of litigation.

## Equifax's Violations of § 1681i Were Willful

129.  15 U.S.C. § 1681i provides for only two scenarios in which a CRA *may* legally be allowed to refrain from notifying the furnisher of disputed information of

a consumer's dispute: (1) if the CRA determines that a consumer's dispute is frivolous or irrelevant; and/or, (2) if the CRA resolves the dispute under an expedited dispute resolution process.

130. Neither scenario applies to Equifax's conduct complained of herein.

131. The first statutory exception to the notice requirements of § 1681i(a)(2) is provided by § 1681i(a)(3), under which Equifax *may* be relieved of its duty to notify the furnisher of the disputed information if Equifax determines that a consumer's dispute is frivolous or irrelevant.

132. To invoke the 1681i(a)(3) exception, Equifax must make the determination that the dispute is frivolous or irrelevant within five business days of receipt of the dispute, and must notify the consumer of Equifax's determination.

133. The consumer notice required by § 1681i(a)(3) must: (1) be given in writing or by other means authorized by consumer; (2) be given within five days of Equifax's determination; (3) state the reason(s) Equifax determined the dispute was frivolous or irrelevant; and, (4) identify any information required to investigate the disputed information.

134. Equifax met none of the consumer notice requirements of § 1681i(a)(3).

135. Thus, the "frivolous or irrelevant dispute" exception to the furnisher notice requirements of § 1681i(a)(2) does not apply.

136.  The second exception to the notice requirements of § 1681i(a)(2) is provided by § 1681i(a)(8), under which Equifax *may* be relieved of its duty to notify the furnisher of the disputed information if the dispute is resolved through an expedited resolution process.

137.  Under § 1681i(a)(8), a CRA may resolve a consumer's dispute through an expedited resolution process by deleting the disputed information no later than three business days after receipt of the consumer's dispute.

138.  The expedited resolution process under § 1681i(a)(8) further requires the CRA to: (1) delete the disputed information within three business days of receiving the consumer's dispute; (2) provide prompt notice of the deletion to the consumer by telephone; (3) inform the consumer of their right to have the CRA notify specific persons, who previously received the consumer's report, that the disputed information has been deleted; and, (5) provide the consumer with written confirmation of the deletion, and a consumer report based on the deletion within five days.

139.  Equifax failed to meet the requirements of § 1681i(a)(8) for an expedited review process.

140.  Thus, the "expedited resolution" exception to the furnisher notice requirements of § 1681i(a)(2) does not apply.

141.  In fact, Equifax did not claim to be operating under any exception to the furnisher notice requirements of § 1681i(a)(2).

142.  Rather, Equifax claimed to have conducted an investigation the dispute.

143.  In the reinvestigation report dated June 18, 2020, and sent directly to Plaintiff at Plaintiff's home address, Equifax stated, "We are pleased to let you know that the results of the dispute you recently filed with Equifax are complete. […] If we were able to make changes to your credit report based on the information provided, we have done so. Otherwise, we contacted the company reporting the information to Equifax for them to investigate your dispute."

144.  The statement "We are pleased to let you know that the results of the dispute you recently filed with Equifax are complete. […] If we were able to make changes to your credit report based on the information provided, we have done so. Otherwise, we contacted the company reporting the information to Equifax for them to investigate your dispute." is false, as Equifax conducted no investigation at all.

145.  However, the statement does make it clear that Equifax did not determine Plaintiff's dispute to be frivolous or irrelevant.

146.  Further, the statement makes it plainly clear that Equifax received Plaintiff's dispute, accepted it as a valid, purported to have conducted "a reasonable

reinvestigation," and thus knew that it had specific statutory duties it was required to fulfill.

147.  Nevertheless, Equifax failed to fulfill those duties.

148.  At a minimum, any "reinvestigation" by Equifax would require Equifax to notify Quicken within five days of Equifax's receipt of the consumer's dispute, and include all relevant information regarding the dispute.  15 U.S.C. § 1681i(a)(2).

149.  Equifax did not notify the furnisher of the disputed information in this case.

150.  Equifax's regular method of notifying furnishers of consumers' disputes is via ACDVs sent through the e-Oscar system.

151.  Equifax did not send an ACDV to Quicken in connection with Plaintiff's dispute.

152. Instead, Equifax simply deleted the Quicken tradeline, without conducting a reasonable reinvestigation and without providing Quicken with proper notice of the dispute, in reckless disregard of its duties under the FCRA.

153.  Equifax took specific actions and made affirmative statements which clearly communicated that Equifax received and accepted Plaintiff's dispute as valid.

154.  Absent application of one of the two exceptions described *supra*, no objectively reasonable interpretation of 15 U.S.C. § 1681i would permit Equifax to legally fulfill its duties without notifying Quicken of Plaintiff's dispute within 5 business days.

155.  Equifax has a regular practice of deleting disputed mortgage tradelines without notifying the furnisher of the disputed information of the consumers' disputes, and without calling consumers to provide prompt notice of the deletion be telephone.

156.  Equifax's deletion of the Quicken tradeline without performing a reasonable reinvestigation, without notifying Quicken of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, rises above simple negligence or a careless reading of the statute.

157.  Equifax's deletion of the Quicken tradeline without performing a reasonable reinvestigation, without notifying Quicken of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, was done knowingly and with reckless disregard of its legal duties.

158.  Equifax's deletion of the Quicken tradeline without performing a reasonable reinvestigation, without notifying Quicken of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, was willful.

36

159. Equifax's deletion of the Quicken tradeline without performing a reasonable reinvestigation, without notifying Quicken of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, made it highly probable that Plaintiff would be injured.

160. Plaintiff was, in fact, injured, as detailed more fully *infra*.

161. Equifax's violations of § 1681i were a direct and proximate cause of Plaintiff's injuries, as detailed more fully below, and, as a result, Equifax is liable to Plaintiff for the full amount of statutory damages and punitive damages, along with the attorneys' fees and the costs of litigation.

162. Plaintiff's dispute was clear and unambiguous as to the inaccurate information that Equifax was reporting.

163. Equifax had clear notice that the information it was reporting was false and misleading.

164. Plaintiff provided Equifax with all of the necessary information for Equifax and Quicken to investigate Plaintiff's dispute, and to correct the false and misleading information.

165. If Equifax had conducted a reasonable reinvestigation and notified Quicken of Plaintiff's dispute, the Quicken Mortgage information would be reported

accurately with the correct balance, instead of being deleted from Plaintiff's consumer reports.

166.  Equifax knew that it had a duty to conduct a reasonable reinvestigation of Plaintiff's dispute.

167.  Equifax had the ability to easily conduct a reasonable reinvestigation of Plaintiff's dispute.

168.  Despite the foregoing, Equifax made the intentional choice to not conduct a reasonable reinvestigation of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

169.  Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(1) under which Equifax could legally disregard its duty to conduct a reasonable reinvestigation.

170.  Equifax's failure to conduct a reasonable reinvestigation was willful.

171.  Equifax knew that it had a duty to notify Quicken of Plaintiff's dispute within five business days of receiving Plaintiff's dispute.

172.  Equifax had the ability to easily notify Quicken of Plaintiff's dispute, via e-Oscar or otherwise.

173.  Despite the foregoing, Equifax made the intentional choice to not notify Quicken of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

174.  Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(2) under which Equifax could legally disregard its duty to notify Quicken of Plaintiff's dispute.

175.  Equifax's failure to notify Quicken of Plaintiff's dispute was willful.

176.  Equifax knew that if it chose to resolve Plaintiff's dispute as an Expedited Dispute Resolution under § 1681i(a)(8), then in order to *potentially* avoid the requirement to provide Quicken with notice of Plaintiff's dispute under § 1681i(a)(2), Equifax had a duty to provide Plaintiff with prompt notice of the deletion of the Quicken tradeline by telephone.

177.  Equifax had the ability to easily provide Plaintiff with prompt notice of the deletion of the Quicken tradeline by telephone.

178. Despite the foregoing, Equifax made the intentional choice to not provide Plaintiff with prompt notice of the deletion of the Quicken tradeline by telephone, in reckless disregard of its duties under the FCRA.

179.  Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(8) under which Equifax could legally not provide Plaintiff with prompt notice of the deletion of the Quicken tradeline and disregard its duty to notify Quicken of Plaintiff's dispute.

180. Equifax's failure to provide Plaintiff with prompt notice of the deletion of the Quicken tradeline was willful.

181. Equifax knew that it had a duty to provide Plaintiff with the procedures Equifax *actually used* to determine the accuracy and completeness of the disputed Quicken Mortgage information.

182. Equifax had the ability to easily provide Plaintiff with the procedures Equifax *actually used* to determine the accuracy and completeness of the disputed Quicken Mortgage information.

183. Despite the foregoing, Equifax made the intentional choice to not provide the procedures it *actually used*, and instead sent a nonresponsive form letter, in reckless disregard of its duties under the FCRA.

184. Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(7) under which Equifax could legally disregard its duty to provide the procedures it *actually used*, when it purported to conduct a reasonable reinvestigation of Plaintiff's dispute.

185. Equifax's failure to notify Plaintiff of the procedures used to investigate Plaintiff's dispute was willful.

186.   Equifax knew that it had a duty to provide Plaintiff with the business name and contact information of any furnisher that Equifax contacted in connection with Plaintiff's dispute.

187.   Equifax had the ability to easily notify Quicken of Plaintiff's dispute, and had Equifax done so, Equifax could have easily provided Plaintiff with the business name and contact information of any furnisher of information that Equifax contacted in connection with Plaintiff's dispute.

188.   Despite the foregoing, Equifax made the intentional choice to not notify Quicken of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

189.   Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(2) under which Equifax could legally disregard its duty to notify Quicken of Plaintiff's dispute.

190.   Equifax's failure to provide Plaintiff with the business name and contact information for the furnishers it contacted in its investigation of Plaintiff's dispute was willful.

**Equifax did Not Follow Reasonable Procedures To Assure Maximum Possible Accuracy of Information Regarding Plaintiff as Required by the FCRA**

191.   Equifax failed to follow reasonable procedures to assure maximum possible accuracy of Information Regarding Plaintiff by disregarding the true and correct balance information Quicken reported to Equifax (assuming such balance

was reported), and instead reporting Plaintiff's Mortgage with a $0 balance; alternatively, if the balance was not reported upon dispute, Equifax did not notify Quicken, which was also unreasonable.

### Equifax has Exhibited a Pattern and Practice of Disregarding Its Statutorily Mandated Duties Under the FCRA

192. Upon information and belief, Equifax regularly deletes disputed tradeline information without conducting a reasonable reinvestigation to determine whether the disputed information is inaccurate, without properly notifying the furnisher of the disputed information of the dispute, and without providing prompt notice of the deletion to the consumer by telephone.

193. Equifax's conscious disregarded of its duties under various subsections of § 1681i, including but not limited to paragraphs (a)(1), (a)(2), (a)(4), (a)(7), and (a)(8) is a regular, widespread business practice.

194. As such, Equifax has evinced a pattern and practice of recklessly disregarding its statutorily mandated duties under the FCRA.

195. Equifax's pattern and practice of violating its statutorily mandated duties under the FCRA is further evidence that Equifax's actions and omissions complained of herein were willful.

## Equifax has Injured Plaintiff by Publishing False, Defamatory Information About Plaintiff to Third Parties

196.  Equifax injured Plaintiff by publishing the false, defamatory, Mortgage data to third parties.

197.  Equifax has published consumer reports, orally and/or through writing, to various creditors, prospective credit grantors, other credit reporting agencies, and other entities that contain the false, defamatory blank Mortgage balance and closed status.

198.  Upon information and belief, Equifax has published the false, defamatory Mortgage information on Plaintiff's consumer report to third parties, including but not limited to the following: LexisNexis on April 1, 2019; LexisNexis on August 16, 2019; Midnight on August 22, 2019; and CIC/Experian Reports on February 5, 2020.

199.  Equifax knew that the blank Mortgage balance and closed status were false when Equifax published that information, and had no factual basis for stating that the Mortgage balance was blank and had a status of closed, as that is not the balance nor the status Quicken reported to Equifax.

200.  Equifax's publication of the false blank Mortgage balance and closed status information negatively affects Plaintiff in the form of dignitary and reputational harm.

43

201.  Equifax's publication of the false blank Mortgage balance and closed status is a direct and proximate cause of the injury to Plaintiff's dignitary and reputational harm.

## Equifax has Injured Plaintiff
## By Improperly Diminishing Plaintiff's Credit Score

202.  Equifax has injured Plaintiff by diminishing Plaintiff's FICO and other credit scoring model scores.

203.  Equifax impermissibly deleted Plaintiff's Quicken tradeline from Plaintiff's consumer report without conducting a conducting a reasonable reinvestigation of the disputed information, and without notifying Quicken of Plaintiff's dispute.

204.  The deletion of the Quicken tradeline from Plaintiff's consumer report negatively affects and diminishes Plaintiff's FICO and other credit scoring model scores, by excluding otherwise positive payment history, length of credit history, and credit mix information that would, but for the deletion, be used to calculate Plaintiff's credit score.

205.  The Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct.

44

Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged

a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

206. Plaintiff is desirous of improving her FICO and other credit risk modeling scores.

207. As such, Plaintiff took specific actions to address inaccuracies in her credit report.

208. If Equifax had conducted a reasonable reinvestigation and had notified Quicken of Plaintiff's dispute, the Quicken tradeline would be reporting as a current, positive account.

209. If the Quicken tradeline was reporting as a current, positive account, Plaintiff's FICO and other credit scoring model scores would be improved.

210. Equifax's deletion of the Quicken tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying Quicken of Plaintiff's dispute, is a direct and proximate cause of the decrease to Plaintiff's FICO and other credit scoring model scores.

### Equifax has Injured Plaintiff by Creating an Imminent Material Risk of Financial Harm to Plaintiff Via Increased Insurance Costs

211. Equifax injured Plaintiff by exposing Plaintiff to an imminent material risk of financial harm in the form of higher insurance premiums/rates.

212. Equifax impermissibly deleted Plaintiff's Quicken tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying Quicken of Plaintiff's dispute.

213. Insurance carriers regularly review consumers' credit scores and consumer reports to calculate credit-based insurance scores, and thereby determine if the carrier is willing to offer a particular consumer insurance, and what premium the carrier will charge.

214. Plaintiff's credit-based insurance scores are calculated based on information contained in Plaintiff's consumer report.

215. Falsely reporting Plaintiff's Mortgage with a blank balance, closed status and verbiage such as "Included in Bankruptcy" will result in a user of Plaintiff's consumer report to incorrectly conclude that Plaintiff is not current on the Mortgage, and that the Mortgage was discharged in bankruptcy.

216. Improperly deleting Plaintiff's Mortgage tradeline from Plaintiff's consumer report will result in a user of Plaintiff's consumer report to incorrectly conclude that Plaintiff does not have a mortgage.

217. The deletion of the Quicken tradeline from Plaintiff's consumer report negatively affects and diminishes Plaintiff's credit-based insurance score, by excluding otherwise positive information, such as length and age of credit history

and the use of certain types of credit, that would, but for the improper deletion, be used to calculate Plaintiff's credit-based score.

218.  Insurers use Plaintiff's credit-based scores to assign Plaintiff to risk pools and to determine the premiums that Plaintiff's will pay for insurance.

219.  Plaintiff is a homeowner, and her Mortgage note requires Plaintiff to maintain insurance on the property securing the Mortgage note.

220.  Plaintiff owns and drives a car, and by law Plaintiff is required to maintain automobile insurance.

221.  The deletion of the Quicken tradeline from Plaintiff's consumer report injures Plaintiff by excluding positive information that would otherwise be used to calculate Plaintiff's credit-based insurance scores, and thus creates the imminent material risk that Plaintiff will suffer financial harm in the form of higher homeowner's and automobile insurance rates.

222.  Equifax's deletion of the Quicken tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying Quicken of Plaintiff's dispute, is a direct and proximate cause of Plaintiff's imminent material risk of financial harm in the form of higher insurance rates.

**<u>Equifax has Injured Plaintiff By Creating Impediments to Plaintiff
Refinancing her Mortgage, Which Further Harms Plaintiff Financially</u>**

223.  Equifax has injured Plaintiff by creating higher barriers and increased costs for Plaintiff to refinance her Mortgage.

224. Equifax impermissibly deleted Plaintiff's Quicken tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying Quicken of Plaintiff's dispute.

225.  Mortgage lending, including refinancing, is a competitive market, with lenders competing for consumers' business by offering better, more competitive rates and terms, and potential additional savings via quick turnarounds on refinancing.

226.  Because mortgage rates fluctuate daily, Plaintiff's ability to capitalize on advantageous mortgage opportunities is dependent on Plaintiff's consumer reports containing complete, accurate data.

227.  The existence of consumer reports which inaccurately report Plaintiff's Mortgage with a blank balance and closed status make it inherently more difficult and more expensive for Plaintiff to refinance the Mortgage.

228.  Likewise, the existence of a consumer report that does not include Plaintiff's Mortgage also increases the difficulty and cost to refinance a mortgage.

229. For example, for Plaintiff to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiff's full credit report–not just the Plaintiff's credit score–and analyze the Plaintiff's credit history, liabilities, and debts to determine creditworthiness.

U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF* (January 16, 2018) [https://perma.cc/UE3H-N3BS].

230. To obtain an FHA refinance of the Mortgage, the lender must be able to verify the Plaintiff's payments for the Mortgage for the preceding 12 months. *Id*. at 409.

231. In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

232. Plaintiff's correct payment history would be included in Plaintiff's credit report if Equifax had conducted an appropriate reinvestigation and had notified Quicken of Plaintiff's dispute.

233. However, because the Mortgage is not reported in the Plaintiff's credit report, Plaintiff will be forced to pursue alternative means of demonstrating their payment history to a potential lender.

234. Because Equifax improperly deleted the Mortgage from Plaintiff's credit report, Plaintiff will be need to obtain/provide verification of the Mortgage, bank statements, and/or other documents to demonstrate the Plaintiff's payment history for the previous 12 months. *Id*.

235. This requires Plaintiff to expend time, effort, and money due to Defendant's failure to abide by its obligations under the FCRA to accurately report Plaintiff's credit history.

236. In order for Plaintiff to obtain a Fannie Mae refinance of the Mortgage, the lender must review Plaintiff's credit report – not just the Plaintiff's credit score – as well as all credit information, to determine that the credit report meets Fannie Mae's requirements and that the data is accurate. Federal National Mortgage Association, *Selling Guide: Fannie Mae Single Family*, 501 (May 31, 2016).

237. Accurate credit report data is crucial, as errors in Plaintiff's credit report may negatively impact the underwriting recommendation. *Id*. at 327.

238. A key factor in the lender's analysis is the age of Plaintiff's credit history, as older, more established accounts represent a lower credit risk. *Id*. at 503.

239.  However, because Plaintiff's Mortgage trade line has been improperly deleted from Plaintiff's credit report, Plaintiff's will appear to present a higher credit risk than she actually does.

240.  The lender must also review Plaintiff's credit report to obtain information about the status of all mortgage accounts, including their payment history. *Id*. at 504.

241.  However, because Plaintiff's credit report does not contain adequate information regarding the Mortgage Plaintiff must work with the lender to obtain/provide the necessary information via a mortgage verification, loan payment history from Quicken, and/or Plaintiff's canceled checks for the last 12 months.  *Id*.

242.  In total, Equifax's improper deletion of the Mortgage tradeline from Plaintiff's credit report will dramatically increase the time, effort, and money which would be required for Plaintiff to refinance her Mortgage.

243.  Due to Defendant's improper deletion of Plaintiff's mortgage tradeline, in order to refinance her Mortgage, Plaintiff would be required to gather a multitude of facts and figures from Plaintiff's current lender in order to demonstrate to any prospective lender that Plaintiff actually *has* a mortgage, and that Plaintiff fit within the lender's mortgage lending guidelines and approval standards.

244.  This information is data that would be reflected in Plaintiff's consumer reports, if the reports were accurate and complete.

245.  Plaintiff is desirous of more favorable mortgage terms.

246. Plaintiff's pending bankruptcy does not preclude Plaintiff from obtaining credit or refinancing the Mortgage. On the contrary, and it is not uncommon for consumers in an active chapter 13 bankruptcy case to access the credit markets form the replacement or acquisition of vehicles and the refinancing of mortgage debt.[3]

247.  In point of fact, the FHA has a program for approving borrowers who are still making payments in a pending/active a Chapter 13 Bankruptcy. U.S. Department of Housing and Urban Development, *HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance* (March 24, 2011) p 4-C-13, available at *https://www.hud.gov/sites/documents/41551HSGH.PDF*,

See also, *https://www.fha.com/fha_requirements_credit.*

248. The improper deletion of the Quicken tradeline from Plaintiff's consumer report injures Plaintiff by creating barriers to Plaintiff's ability to

---

[3] The Federal Rules of Bankruptcy Procedure specifically provide for the method by which consumers in an active bankruptcy obtain approval for obtaining credit. FRBP 4001(c).

refinance the Mortgage, and by increasing the costs that Plaintiff will incur upon attempting to refinance the Mortgage.

249.  Equifax's deletion of the Quicken tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying Quicken of Plaintiff's dispute, is a direct and proximate cause of Plaintiff's increased difficulty of refinancing the Mortgage and the higher costs that Plaintiff will incur upon attempting to refinance the Mortgage.

## Equifax has Injured Plaintiff by Failing to Disclose Information that Plaintiff is Legally Entitled to Receive from Equifax

250.  Equifax has injured Plaintiff by failing to disclose information that Plaintiff is legally entitled to receive from Equifax.

251.  Plaintiff requested specific information from Equifax regarding the procedures Equifax followed and the contact information Equifax used to contact Quicken, when it purported to have reinvestigated Plaintiff's dispute and deleted information from her credit file and consumer report.

252.  Despite Equifax's clear legal obligation to provide this information, which Plaintiff was legally entitled to receive, Equifax willfully failed to do so in reckless disregard of its duties under the FCRA.

253.  The invasion of Plaintiff's right to receive information from Equifax regarding the procedures Equifax followed, and the contact information Equifax used to contact Quicken, is not hypothetical, uncertain, or abstract – Plaintiff did not receive information to which she was legally entitled to receive from Equifax.

254.  The Court has held that held that statutory violations alone, under the FCRA, Fair Debt Collection Practices Act, Telephone Consumer Protection Act, and Video Privacy Protection Act, can be sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III.  *Church v. Accretive Health, Inc.*, 654 Fed. Appx. 990 (11th Cir. 2016); and, *Perry v. Cable News Network, Inc., et al.*, No. 16-13031 (11th Cir. April 27, 2017).

255.  An injury-in-fact sufficient to satisfy Article III standing requirements "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Church*, at 993, quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982).

256. Equifax has injured Plaintiff's statutorily-created right to receive specific information from Equifax pursuant to the FCRA.

257. The FCRA creates a private right of action, which Plaintiff seeks to enforce.

258.  The Act requires Equifax to disclose specific information regarding the procedures Equifax followed, and who Equifax contacted, when Equifax purported to have reinvestigated Plaintiff's dispute, and to make that disclosure within fifteen days of receiving Plaintiff's request for the information. 15 U.S.C. § 1681i(a)(7).

259.  Equifax failed to provide a description of the procedures it actually followed, and instead responded to Plaintiff's request with a vague form letter that stated what Equifax *might* have done depending on what information Plaintiff submitted.

260.  Equifax failed to provide the name and/or contact information of any furnisher of information that Equifax contacted in connection with its alleged reinvestigation of Plaintiff's dispute.

261.  Further, Equifax's failure to provide the name and/or contact information of any furnisher of information that Equifax contacted in connection with its alleged reinvestigation of Plaintiff's dispute is more than a bare procedural or statutory violation, divorced from any real-world effect.

262.  Quicken maintains multiple addresses for various purposes, and Plaintiff sought to determine the specific address at which Equifax actually contacted Quicken in connection with Plaintiff's dispute.

263.  Equifax's willful failure to provide this information denies Plaintiff the ability to contact the department and/or individual(s) at Quicken that process FCRA disputes.

264.  Equifax's willful failure to provide this information denies Plaintiff the ability to follow up in any meaningful way on Equifax's alleged reinvestigation of Plaintiff's dispute.

265.  Equifax's willful failure to provide this information thwarts Plaintiff's efforts to ensure Plaintiff's consumer report is fair, accurate, and correct.

266.  Equifax's willful failure to provide this information makes the credit reporting dispute/resolution process inefficient and ineffective for Plaintiff.

267.  Equifax's failure to provide Plaintiff with specific information that Plaintiff is legally entitled to receive from Equifax is the direct and proximate cause of Plaintiff's inability to resolve Plaintiff's credit reporting issues.

268.  Equifax's failure to provide Plaintiff with specific information that Plaintiff is legally entitled to receive from Equifax is the direct and proximate cause of Plaintiff's inability ensure Plaintiff's consumer report is fair, accurate, and correct.

### Equifax has Injured Plaintiff by Inflicting Actual Harm in the Form of Anxiety, Frustration,  Worry, and Time Spent to Correct Reporting Status of her Mortgage and the Prospect of Lowered Credit

269.  Plaintiff declared bankruptcy in order to get a fresh financial start.

270.  Her mortgage is one of, if not the only way to build credit during the course of her bankruptcy.

271.  Equifax's illegal treatment of the account caused Plaintiff to worry that her financial rehabilitation enabled by the bankruptcy was in jeopardy.

272.  Plaintiff spent time reviewing and disputing her reports and  consulting with her attorneys to ameliorate the false/suppressed credit information resulting from Equifax's illegal conduct.

### Damages

273.  Equifax's conduct in connection with this case was willful.

274.  Specifically, Equifax willfully:

   a.  Reported false information regarding Plaintiff and the Mortgage to third parties;

   b.  Failed to conduct a reasonable reinvestigation into Plaintiff's dispute;

   c.  Failed to notify Quicken of Plaintiff's dispute;

d.  Failed to provide Plaintiff with prompt notice of the Quicken tradeline deletion by telephone;

e.  Failed to provide Plaintiff with the procedures Equifax *actually used* to determine the accuracy and completeness of the disputed Quicken information; and

f.  Failed to provide Plaintiff with the business name and contact information of any furnisher of information that Equifax contacted in connection with Plaintiff's dispute; and

g.  Created impediments and additional financial barriers to the Plaintiff refinancing her existing mortgage obligation and otherwise accessing the credit markets;

275.  These willful actions were taken by Equifax in reckless disregard of its duties under the FCRA.

276. As a result of Equifax's willful actions and omissions, Plaintiff is entitled to recover statutory damages.

277. As a result of Equifax's willful actions and omissions, Plaintiff is entitled to recover punitive damages.

278. As a result of Equifax's willful actions and omissions, Plaintiff is entitled to recover the costs of this action together with reasonable attorney's fees as determined by the court.

279. Additionally, as a result of Equifax's actions and omissions, Plaintiff has suffered actual damages.

280. As a result of the actions and omissions of Defendants, Plaintiff's actual damages include the illegitimate suppression of Plaintiff's FICO credit score and other credit rating modeling scores.

281. Equifax's failures to correct and clear the inaccuracies on Plaintiff's credit report creates a material risk of financial harm to Plaintiff stemming from the decreased perception of Plaintiff's creditworthiness.

## CAUSES OF ACTION

### COUNT I

#### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
#### 15 U.S.C. § 1681e(b)

282. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

283. Pursuant to § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information concerning Plaintiff whenever they prepare consumer reports about Plaintiff.

284. Equifax disregarded Quicken's reporting of the correct Mortgage balance.

285. Equifax instead reported the Mortgage balance as blank with a status of closed.

286. Equifax reported the Mortgage balance as blank with a status of closed in reckless disregard of its duties under the FCRA.

287. Upon information and belief, Equifax reported the false closed status and blank Mortgage balance to third parties, in reckless disregard of its duties under the FCRA.

288. Upon information and belief Equifax has a policy/procedure in place, whereby once a furnisher reports a consumer's mortgage account with a Consumer Information Indicator indicating that the consumer is in bankruptcy, or Equifax learns of the bankruptcy via a consumer's dispute, Equifax thereafter disregards the true and correct balance reported by the furnisher, and incorrectly reports the mortgage account with a blank balance and closed status.

289. Upon information and belief, Equifax's policy/procedure of incorrectly reporting mortgages with a blank balance and status of closed, as described above, is widespread, a regular business practice within Equifax, and not an isolated incident.

290.  Equifax has evinced a pattern and practice of willfully disregarding furnishers' reporting and incorrectly reporting mortgage balances as blank with a status of closed, in reckless disregard of its duties under the FCRA.

291.  As described herein, Equifax violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in her consumer report, in reckless disregard of its duties under the FCRA.

292.  Equifax's actions and omissions as described herein were willful, rendering Equifax liable to Plaintiff for statutory and/or punitive damages pursuant to 15 U.S.C. § 1681n.

293.  Plaintiff is entitled to recover costs and attorney's fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **COUNT II**

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(1)(A)

294.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

295.  Under the FCRA, Equifax has a duty to make reasonable efforts to reinvestigate and correct inaccurate or incomplete information brought to its

attention by Plaintiff. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991).

296. To determine whether Plaintiff identified a factual inaccuracy on her consumer report that would trigger Equifax's duty to reinvestigate, the decisive inquiry is whether Equifax could have uncovered the inaccuracy if it had reasonably reinvestigated the matter. *Id*. See also, *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68, 2008 U.S. App. LEXIS 8030, *17-18.

297. Equifax could have uncovered the inaccuracy if Equifax had reasonably reinvestigated the dispute submitted by Plaintiff.

298. Pursuant to §1681i(a)(1)(A), Equifax had an affirmative duty to independently reinvestigate the dispute submitted by Plaintiff.

299. A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

300. In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

301.  As described herein, Equifax violated 15 U.S.C. § 1681i(a)(1)(A) in multiple ways, including without limitation, by failing to conduct a reasonable reinvestigation, either standard or expedited, of Plaintiff's dispute.

302.  Equifax's actions and omissions as described herein were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

303.  Equifax's actions and omissions as described herein were undertaken in reckless disregard for its duties under the FCRA.

304.  Plaintiff is entitled to recover costs and attorney's fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **COUNT III**

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(2)

305.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

306.  Under the FCRA, Equifax has a duty to make reasonable efforts to reinvestigate and correct inaccurate or incomplete information brought to its attention by Plaintiff. *Cahlin*, 936 F.2d at 1160.

307.  To determine whether Plaintiff identified a factual inaccuracy on her credit report that would trigger Equifax's duty to reinvestigate, the decisive inquiry

is whether Equifax could have uncovered the inaccuracy if it had reasonably reinvestigated the matter. *Id*.; and *DeAndrade*, 523 F.3d at 68.

308.   Equifax's reasonable reinvestigation, as required by the FCRA, consists largely of triggering the investigation by the furnisher, as the furnisher of information stands in a far better position to make a thorough investigation of the accuracy of the disputed information than Equifax does. *Serfess v. Equifax Credit Info. Servs.*, No. 13-406 (RBK/JS), 2014 U.S. Dist. LEXIS 120138, at *20-21 (D.N.J. Aug. 28, 2014).

309.   Equifax could have uncovered the inaccuracy if Equifax had reasonably reinvestigated the dispute submitted by Plaintiff.

310.   Equifax could have uncovered the inaccuracy if Equifax had notified Quicken of Plaintiff's dispute.

311.   Pursuant to § 1681i(a)(2), Equifax had a duty to notify Quicken of Plaintiff's dispute within five business days of receiving the dispute, and to provide Quicken all of the relevant information Plaintiff provided to Equifax in her dispute.

312.   As described herein, Equifax violated 15 U.S.C. § 1681i(a)(2) by failing to properly notify Quicken of Plaintiff's dispute and/or by failing to provide Quicken all of the relevant information Plaintiff provided to Equifax in her dispute.

313. Equifax's actions and omissions as described herein were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

314. Equifax's actions and omissions as described herein were undertaken in reckless disregard for its duties under the FCRA.

315. Plaintiff is entitled to recover costs and attorney's fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT IV

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(7)

316. Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

317. Pursuant to § 1681i(a)(7), Equifax had a duty to provide Plaintiff a description of the procedures Equifax actually used to determine the accuracy and completeness of the disputed Quicken Mortgage information concerning Plaintiff in her file and consumer report.

318. As described herein, Equifax violated 15 U.S.C. § 1681i(a)(7) by *twice* failing to provide Plaintiff a description of the procedures Equifax actually used to determine the accuracy and completeness of the disputed Quicken Mortgage information concerning Plaintiff in her file and consumer report.

66

319.  Pursuant to § 1681i(a)(7), Equifax had a duty to provide Plaintiff with the business name and contact information of any furnisher of information that Equifax contacted in connection with Plaintiff's dispute.

320.  As described herein, Equifax violated 15 U.S.C. § 1681i(a)(7) by *twice* failing to provide Plaintiff with the business name and contact information of any furnisher of information that Equifax contacted in connection with Plaintiff's dispute.

321.  Equifax's actions and omissions as described herein were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

322.  Equifax's actions and omissions as described herein were undertaken in reckless disregard for its duties under the FCRA.

323.  Plaintiff is entitled to recover costs and attorney's fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## TRIAL BY JURY

324.  Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Equifax for:

a)  Statutory damages pursuant to 15 U.S.C. § 1681n;

b) Punitive damages pursuant to 15 U.S.C. § 1681n;

c) Actual damages pursuant to 15 U.S.C. § 1681o;

d) Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e) Such other and further relief as may be just and proper.

Respectfully submitted this 3rd day of June, 2021.

BERRY AND ASSOCIATES

*/s/ Joseph L. Erkenbrack*

Matthew T. Berry
Georgia Bar No. 055663
*matt@mattberry.com*

Joseph L. Erkenbrack
Georgia Bar No. 801728
jerkenbrack@mattberry.com

Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, Georgia 30324

OFFICE   (678) 996-5172
FAX      (678) 996-5198

Counsel for Plaintiff